# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| NATHAN MOORE, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | Case No. 3:24-cv-61 |
| | : | |
| v. | : | Judge Thomas M. Rose |
| | : | |
| SAFECO INSURANCE | : | |
| COMPANY OF INDIANA, | : | |
| | : | |
| Defendant. | : | |
| | : | |

---

### ENTRY AND ORDER GRANTING, IN PART, AND DENYING, IN PART, SAFECO INSURANCE COMPANY OF INDIANA'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 20)

---

Currently before the Court is Safeco Insurance Company of Indiana's Motion for Summary Judgment (the "Motion") (Doc. No. 20). Plaintiffs Nathan Moore ("Mr. Moore") and Emily Moore ("Mrs. Moore") (collectively the "Moores") have brought suit against their former homeowner's insurance provider, Defendant Safeco Insurance Company of Indiana ("Safeco"), alleging breach of contract and bad faith after Safeco denied the Moores' homeowner's insurance claim of theft loss in 2023. (Doc. No. 3 at PageID 115-16.) Safeco contends that that the Moores did not suffer a covered theft, as contemplated by their Safeco homeowner's insurance policy (the "Policy") (Doc. No. 3 at PageID 129-85). (Doc. No. 20 at PageID 1509-10.) Because the Moores did not suffer a covered theft under the Policy, says Safeco, Safeco was reasonably justified in denying the Moores' claim and cannot be liable for handling the claim in bad faith. (*Id.* at PageID 1520-22.) For the reasons set forth herein, the Court **GRANTS, IN PART, AND DENIES, IN PART,** Safeco's Motion.

1

I.    **BACKGROUND**

This case ultimately stems from the Policy that the Moores purchased from Safeco, effective July 5, 2021, through July 5, 2022. (*See* Doc. No. 3 at PageID 114.) In typical fashion, the Policy covered losses to the Moores' personal property within their home, when the loss resulted from a covered peril to the home. (*See id.* at PageID 140-41.) Covered perils under the Policy included events such as fire and lightning, wind and hail, sudden accidents, and falling objects. (*Id.*) Pertinently, the Policy covered losses to personal property resulting from theft. (*Id.*) In total, the Policy's theft provision affords coverage for:

> Theft, including attempted theft and loss of property from a known location when it is likely that the property has been stolen.
>
> This peril does not include loss caused by theft:
>
> a. Committed by any insured or by any other person regularly residing on the insured location;
> b. in, to or from a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is completed and occupied; or
> c. from that part of a residence premises rented by any insured to other than an insured.
>
> This peril does not include loss caused by theft that occurs away from the residence premises of property while at any other residence owned, rented to, or occupied by any insured, except while an insured is temporarily residing there.
>
> Property of a student who is an insured is covered while at a residence away from home.

(*Id.*)

In September 2021, the Moores suffered a fire at their home, which dealt damage to their house as well as their personal belongings. (Doc. No. 15-1 at PageID 321, 335-36.) Following the fire, the Moores submitted a fire claim to Safeco. (*Id.* at PageID 368.) In preparing their claim, the Moores created an inventory of all items damaged in the fire for Safeco's review. (Doc. Nos. 16-1 through 16-35.) Safeco approved the Moores' fire claim and paid them the Policy limit for

personal property lost or damaged in the fire, on October 9, 2021.  (Doc. No. 15-1 at PageID 368; *see also* Doc. No. 17-1 at PageID 1290.)

Shortly after filing their fire loss claim with Safeco, Mr. Moore contacted a local contractor, Maximum Restoration General Contractors LLC ("Maximum Restoration"), to estimate the cost to repair and renovate the Moores' home.  (Doc. No. 15-1 at PageID 321-22.)  On March 23, 2022, Mr. Moore entered into a customer repair agreement with Maximum Restoration.  (Doc. No. 20-2.)  However, neither the Moores nor Maximum Restoration ever agreed on the scope of work that Maximum Restoration would perform.  Rather, Mr. Moore testified that, by entering into an agreement with Maximum Restoration, he only meant to give Maximum Restoration authority to enter his home, conduct an inspection, and provide an estimate for their services.  (Doc. No. 15-1 at PageID 331-32.)

The Moores gave Maximum Restoration access to a key to enter their home, and, on March 30, 2022, Maximum Restoration's agent did just that.  (*Id.* at PageID 323-24, 344.)  By this time, the Moores still had a good bit of personal property such as clothes and electronics inside their house.  (*Id.* at PageID 336.)  During the evening of March 30, 2022, Mr. Moore received a notification on his smartphone, alerting him that someone was trying to use the Moores' doorbell camera.  (*Id.* at PageID 322.)  The Moores left the rental property they were staying in and went to the house to investigate.  (*Id.*)  They found that their doorbell camera was gone, along with other personal property that had been left in the home.  (*Id.*)  Among the missing property were items like the Moores' prescription medications, televisions, laptop computers, and other miscellaneous items.  (*Id.* at PageID 322-23.)  Considering themselves to have been robbed, the Moores contacted the police.  (*Id.* at PageID 323.)  When an officer arrived, Mr. Moore provided a witness statement reporting the robbery and the following missing items: five televisions, one doorbell camera,

"several pieces of jewelry," silver coins, miscellaneous electronics, hand sanitizer, food, cookware, "probably more than 100 bottles of prescription med[ications]," a flashlight, and "other random items." (Doc. No. 20-5 at PageID 1589.) After speaking with the police officer, the Moores deduced that someone from Maximum Restoration must have accessed their home. (*Id.* at PageID 1588.) The Moores declined to pursue criminal charges. (*Id.*)

The Moores took back the house key that they had previously left in a lock box for Maximum Restoration and, the following morning, Mr. Moore contacted Maximum Restoration about the missing property. (Doc. No. 15-1 at PageID 323-24.) Initially, Maximum Restoration's representative was unaware of anyone from their company visiting the Moores' house. (*Id.* at PageID 324.) Though, on the afternoon of March 31, 2022, Mr. Moore received a phone call from another of Maximum Restoration's employees, Donald Frizzell ("Donnie"), stating that he and a friend of his had taken the Moores' items from their home the previous day. (*Id.*)

Donnie explained that because he thought all personal property remaining in the house was being thrown out, he and his friend decided to go in and take the items to either keep for themselves or donate to a local church. (*Id.* at PageID 324-25.) Donnie agreed to return the Moores' property to them. (*Id.*) During his phone call with Mr. Moore, Donnie also advised that subcontractors would be coming the next day, April 1, 2022, to perform content removal, so the Moores should immediately remove all personal property that they wanted to keep from the home. (*Id.*)

As Mr. Moore drove up to his house on March 31, 2022, after speaking with Donnie, he noticed that dumpsters had been delivered early and subcontractors were already disposing of items left in the home. (*Id.* at PageID 327-28.) Because the Moores took the house key they previously left for Maximum Restoration, the subcontractors had broken in through a window.

4

(*Id.* at PageID 328, 344.) After Mr. Moore contacted Maximum Restoration, Donnie came and ordered the subcontractors to leave. (*Id.* at PageID 328-29.)

Donnie also returned some of the Moores' personal property that he had taken. (*Id.* at PageID 329.) He did eventually return everything he took for himself, but could never account for the items taken by his friend. (Doc. No. 20-5 at PageID 1593.) The Moores later followed up with law enforcement to pursue criminal theft charges. (*Id.* at PageID 1592-93.) Following an investigation, police deemed the situation a civil matter and informed the Moores that they would not press charges against anyone for the alleged thievery of the Moores' belongings. (*Id.* at PageID 1592.)

On May 19, 2023, well over a year after the alleged theft of their personal property, the Moores submitted a theft loss claim with Safeco. (Doc. No. 3 at PageID 206.) Safeco ultimately denied the Moores' claim on October 3, 2023. (*Id.*)

Mrs. Moore apparently took charge of communicating with Safeco on behalf of the Moores while their claim was being handled. (*See generally* Doc. No. 19-5.) Mrs. Moore's working relationship with Safeco employees deteriorated quickly. When speaking with a Safeco adjuster, Mrs. Moore complained that the adjuster was not being as responsive as Mrs. Moore would have liked. (*See id.* at PageID 1468.) Mrs. Moore then allegedly heard someone, who Mrs. Moore suspected did not work for Safeco, in the adjuster's background refer to her as a "bitch." (Doc. No. 19-1 at PageID 1368.) On the afternoon of June 6, 2023, Mrs. Moore contacted a Safeco supervisor, Daniel Hughes ("Mr. Hughes"), and, the next morning, Mr. Hughes sent an email agreeing to assign the Moores' claim to a different adjuster. (Doc. No. 19-5 at PageID 1467-68.) Mrs. Moore, however, communicated that she would not be satisfied with anything less than a phone call from Mr. Hughes approving the Moores' theft loss claim. (*Id.* at PageID 1467.) On

June 9, 2023, Mr. Hughes responded, stating that Mrs. Moore would have to speak with an adjuster in Safeco's special investigations unit.  (*Id.* at PageID 1466.)  Within minutes of receiving this message, Mrs. Moore sent Mr. Hughes another email demanding to speak to his supervisor.  (*Id.* at PageID 1465.)  Mrs. Moore emailed Mr. Hughes again about three hours later threatening to publicly deride Mr. Hughes and other Safeco employees on social media.  (*Id.*)  At her deposition, Mrs. Moore testified that she wanted to scare Mr. Hughes and had no real intention of targeting him and his associates online.  (Doc. No. 19-1 at PageID 1382.)

In the end, with their claim being denied, the Moores filed the instant Complaint for Declaratory Judgment and Damages (the "Complaint") (Doc. No. 3) on January 24, 2024, in the Greene County Court of Common Pleas.  Therein, the Moores allege breach of contract and bad faith against Safeco related to Safeco's denial of their theft loss insurance claim.  (*Id.* at PageID 116-18.)  They further seek declaratory judgment to the same ends.  (*Id.* at PageID 116.)  Safeco removed the Complaint to this Court on February 28, 2024.  (*See* Doc. No. 1.)

Safeco filed its current Motion on November 21, 2024.  (Doc. No. 20.)  The Moores submitted their response in opposition to the Motion on December 12, 2024 (Doc. No. 22), and Safeco filed its reply on December 26, 2024 (Doc. No. 23).  Safeco's Motion is presently ripe for review and decision.

## II.     <u>STANDARD OF REVIEW</u>

Rule 56 of the Federal Rules of Civil Procedure provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought" and that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions

of the pleadings, depositions, answers to interrogatories, affidavits or sworn declarations, and admissions on file, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* Fed. R. Civ. P. 56(a), (c).

The burden then shifts to the non-moving party, which "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In opposing summary judgment, the nonmoving party cannot rest on its pleadings or merely reassert its previous allegations. *Id.* at 248-49. It also is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must "go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

A party's failure "to properly address another party's assertion of fact as required by Rule 56(c)" can result in the court "consider[ing] the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e). Additionally, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 255. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* at 255; *Matsushita*, 475 U.S. at 587; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere

7

existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id*. The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id*.

When deciding on a matter of law, "[a] federal court sitting in diversity must apply the substantive law . . . of the state in which it sits." *Phelps v. McClellan*, 30 F.3d 658, 661 (6th Cir. 1994) (citing *Klaxon Co. v. Stenor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S. Ct. 1020, 1021-22 (1941)); *Clutter v. Johns-Manville Sales Corp.*, 646 F.2d 1151, 1153 (6th Cir. 1981). To the extent that the state's highest court has not addressed the issue presented, the federal court must anticipate how the state's highest court would rule. *Imperial Hotels Corp. v. Dore*, 257 F.3d 615, 620 (6th Cir. 2001) (quoting *Bailey Farms, Inc. v. NOR-AM Chem. Co.*, 27 F.3d 188, 191 (6th Cir. 1994)). Moreover, "[i]f the highest court has not spoken, the federal court must ascertain from all available data what the state law is and apply it." *Clutter*, 646 F.2d at 1153.

## III.   ANALYSIS

To resolve Safeco's Motion, the Court must make two general determinations. First, the Court must consider whether there is a genuine dispute of material fact regarding the Moores' claim for breach of contract against Safeco. Second, the Court must contend with the Moores' assertion that Safeco denied their theft loss claim in bad faith.

### A.   Breach of Contract/Coverage

By its Motion, Safeco posits two justifications for its denial of the Moores' theft loss claim, entitling Safeco to judgment as a matter of law. (Doc. No. 20 at PageID 1517-20.) Safeco does not dispute theft of personal property as a covered loss under the Moores' Policy. Rather, Safeco primarily argues that it was categorically correct to deny the Moores' theft loss insurance claim

8

because no theft actually occurred, as contemplated by the terms of the Policy. (*Id.* at PageID 1517-19.) In this vein, Safeco avers that Maximum Restoration's alleged misappropriation of the Moores' personal belongings on March 30 and 31 of 2022 constitutes a civil dispute between two contracting parties rather than a criminal theft covered under the Moores' Policy. (*Id.* at PageID 1518-19.) Alternatively, Safeco submits that the Moores' home was under construction at the time, and, thus, any theft of personal property from the home is expressly excluded from coverage by the theft provision contained in the Policy. (*Id.* at PageID 1519-20.)

In response, the Moores contend that Safeco's definition of theft in this case is far narrower than provided for in the Policy. (Doc. No. 22 at PageID 1673-74.) Moreover, the Moores assert that their home was not under construction at the time of the alleged theft here because the Moores had only gone so far as to grant Maximum Restoration access to estimate the cost of repair and renovation. (*Id.* at PageID 1675-76.)

"It is a long-standing principle of law that an insurance policy is a contract, and that the relationship between the insurer and the insured is purely contractual in nature." *Nationwide Mut. Ins. Co. v. Marsh*, 472 N.E.2d 1061, 1062 (Ohio 1984) (citing *Ohio Farmers Ins. Co. v. Cochran*, 135 N.E. 537 (Ohio 1922)). Courts interpret insurance contracts by "reasonably construing" the agreement based on the "ordinary and commonly understood meaning of the language employed." *Reinbolt v. Gloor*, 767 N.E.2d 1187, 1200 (Ohio Ct. App. 2001) (internal citations and quotation marks omitted). Similar to the interpretation of any contract, a reviewing court must not read its own meaning into the terms of an otherwise unambiguous insurance agreement. *Gomolka v. State Auto. Mut. Ins. Co.*, 436 N.E.2d 1347, 1348 (Ohio 1982); *see also Zinser v. Auto-Owners Ins. Co.*, 2017-Ohio-5668, at ¶ 13 (Ohio Ct. App. 2017) ("[a]n insurance policy is a contract; therefore, a reviewing court must interpret it in accordance with the rules of construction applicable to all other

contracts"). "As a matter of law, a contract is unambiguous if it can be given a definite legal meaning." *Abboud v. Travelers Prop. Cas. Ins. Co.*, No. 1:20-cv-1523, 2022 U.S. Dist. LEXIS 32067, at *12, 2022 WL 541189, at *4 (N.D. Ohio Feb. 23, 2022) (quoting *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003)) (internal quotation marks omitted).

Relevant to the case at bar, Ohio courts have had occasion to give a definite legal meaning to the term "theft," as used in insurance agreements. *See Toms v. Hartford Fire Ins. Co. of Hartford, Conn.*, 63 N.E.2d 909, 911 (Ohio 1945); *see also Riley v. Motorists Mut. Ins. Co.*, 197 N.E.2d 362, 364 (Ohio 1964); *see also Tolson v. Am. Family Ins. Co.*, 2005-Ohio-2434, at ¶11-12 (Ohio Ct. App. 2005). In the context of automobile insurance agreements, the Ohio Supreme Court has defined the term "theft" to "comprehend[] essentially the willful taking or appropriation of one person's property by another wrongfully and without justification and with the design to hold or make use of such property in violation of the rights of the owner." *Toms*, 63 N.E.2d at 911; *Riley*, 197 N.E.2d at 364. An Ohio Court of Appeals later applied this definition in the homeowner's insurance context, in *Tolson*. 2005-Ohio-2434, at ¶11-12. Notwithstanding the broad definition of theft provided in these cases, the rights and intentions of an alleged thief play an important role in determining whether a theft occurred. *See id.* at ¶ 12. To explain, "'one is not chargeable with larceny or theft if in good faith he takes the property of another, believing it to be legally his own and believing that he has a legal right to its possession.'" *Tolson*, 2005-Ohio-2434, at ¶12 (quoting *Riley*, 197 N.E.2d at 365.)

In light of this definition, the Court finds there is a genuine issue of material fact regarding whether the Moores suffered a covered theft of their personal property on March 30, 2022. When Donnie and his friend took the Moores' personal belongings from their home, they believed the items to be abandoned and free for the taking. The Court will not consider whether this purported

intent provided a legally cognizable justification for the misappropriation of the Moores' things because the circumstances raise a question as to the alleged thieves' actual intent. For one, Donnie and his friend ostensibly took the Moores' prescription medications. Even if the Moores had abandoned their medicine, there is no instance where Donnie and his friend could have been legally justified in taking medication not prescribed to them. Furthermore, when asked to return the Moores' taken belongings, Donnie returned only the items he had taken for himself. The personal property taken by Donnie's friend has yet to be returned. It is unclear what specific items have been returned to the Moores. However, it can hardly be said that, as a matter of law, no theft occurred when only some of the property taken has been accounted for at present. Thus, there are genuine issues of material fact to be resolved at trial with respect to whether the Moores suffered a theft loss from their home when Donnie and his friend entered on March 30, 2022.

The same cannot be said, however, for the Moores' personal property that was disposed of in dumpsters on March 31, 2022. All of the circumstances in this regard suggest that Maximum Restoration's subcontractors did not intend to deprive the Moores of their belongings. Rather, it would appear that the subcontractors had a good faith belief that they were to dispose of the contents found in the Moores' home as part of their duties. Additionally, there is no evidence that Maximum Restoration's subcontractors had any designs to hold or make use of the Moores' personal property. They threw the Moores' belongings away and left when they were told to. Even viewing the facts in the Moores' favor, the Court cannot consider these actions as theft within the meaning of the Policy here. Consequently, the Moores' breach of contract claim cannot stand on their allegations related to items removed from their home on March 31, 2022

Tracking Safeco's arguments, the Court would next consider the definite legal meaning of the phrase "under construction," as that term is used in the Moores' insurance Policy. As a matter

of common sense, when one sets out to renovate their home, the home will surely be under construction at some point. Renovation will be considered underway when in the process of restoring "life, vigor, or activity" to the property. *See Baker v. Nationwide Mut. Ins. Co.*, 2013-Ohio-1856, at ¶10 (Ohio Ct. App. 2013) (citations and internal quotation marks omitted). Here, a reasonable fact finder could determine that the Moores' house was not under construction when their personal belongings were allegedly stolen from within. Mr. Moore testified that, although the Moores initially intended to have Maximum Restoration complete their home renovation, Maximum Restoration did not actually have authority to do so at the time the Moores' personal property was taken. (Doc. No. 15-1 at PageID 331-33.) Taking Mr. Moore's representation as true, Maximum Restoration could not have begun restoring life to the Moores' home because the Moores gave Maximum Restoration no such authority. Indeed, the Moores did not even know how much Maximum Restoration would charge them for renovation to begin with. Consequently, respecting this issue, the Court finds a dispute of material fact precluding summary judgment to Safeco.

In sum, the Court finds genuine disputes of material fact as to whether the Moores suffered a theft on March 30, 2022, as contemplated by their Policy, and whether the Moores' home was under construction nonetheless. Yet, the Court finds that the Moores did not suffer a theft on March 31, 2022, when subcontractors discarded the Moores' personal property. Ultimately, the Court **DENIES** Safeco's Motion on the Moores' claim for breach of contract in this matter, to the extent that the Moores' breach of contract claim pertains to items taken from their home on March 30, 2022. However, the Court would **GRANT** Safeco's Motion to the extent that the Moores' breach of contract claim refers to items discarded from their home by Maximum Restoration subcontractors on March 31, 2022.

### B. **Bad Faith**

The Court turns next to the Moores' allegation that Safeco denied their theft loss claim in bad faith. (*See* Doc. No. 3 at PageID 117-18.) Safeco contends that it had reasonable justifications for denying the Moores' theft loss claim. (Doc. No. 20 at PageID 1521-22.) What's more, Safeco states that, when handing the Moores' claim, it only subjected the Moores to procedures such as examinations under oath in an effort to diligently handle the claim pursuant to the Policy's terms. (*Id.* at PageID 1521.) On the other hand, the Moores argue that Safeco handled their theft loss claim in bad faith, and, therefore, Safeco's denial of the claim was arbitrary and capricious. (Doc. No. 22 at PageID 1677.) In particular, the Moores lean on the allegations that an unknown individual in a Safeco adjuster's background called Mrs. Moore a "bitch," that Mr. Hughes "refused to speak with [Mrs. Moore]," and that an adjuster in Safeco's special investigations unit was rude to Mrs. Moore. (*Id.*)

As a rule, insurers have a duty "to act in good faith and accept reasonable settlements," as well as a duty "to act in good faith in handling" the claims of insureds. *Hoskins v. Aetna Life Ins. Co.*, 452 N.E.2d 1315, 1319 (Ohio 1983). To avoid a determination of bad faith, "[t]he conduct of the insurer must be based on circumstances that furnish a reasonable justification therefor." *Hart v. Republic Mut. Ins. Co.*, 87 N.E.2d 347, 349 (Ohio 1949). "Where a claim is fairly debatable the insurer is entitled to refuse the claim as long as such refusal is premised on a genuine dispute over either the status of the law at the time of the denial or the facts giving rise to the claim." *Tokles & Son v. Midwestern Indemn. Co.*, 605 N.E.2d 936, 943 (Ohio 1992) (quoting *Motorists Mut. Ins. Co. v. Said*, 590 N.E.2d 1228, 1236 (Ohio 1992)) (internal quotation marks omitted). In analyzing an insurer's espoused reasonable justification, courts are not permitted to consider the intent of the insurer or its agents. *Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397, 399-400 (Ohio

1994) ("Intent is *not* and has never been an element of the reasonable justification standard" (*emphasis in original*)).

On the facts of the instant matter, the Court finds that Safeco is entitled to summary judgment on the Moores' cause of action for bad faith. To start, Safeco has asserted a reasonable justification for its denial of the Moores' theft loss claim. When denying the claim, Safeco clearly stated its factual determination that the Moores did not suffer a theft, as contemplated by the Policy. (Doc. No. 3 at PageID 206.) Although the Court has found a dispute of material fact in this regard, the facts surrounding the Moores' theft loss claim at least make the factual question of whether a theft occurred debatable. One of the individuals who took the Moores' personal property from their home arguably had every right to be there and the contract that the Moores had with Maximum Restoration certainly contemplated content removal. (Doc. No. 20-2 at PageID 1558.) The Moores had some of their personal belongings returned to them and it is unclear from the record what items the Moores claim were stolen on March 30, 2022, and what items were already damaged in the previous fire. Illustrating Safeco's skepticism to this extent, the Moores themselves did not initially consider the taking of their belongings to be a theft sufficient to pursue criminal charges. To be sure, the Moores did not submit a theft loss claim to Safeco until more than a year after the alleged theft occurred. Accordingly, the Court finds that Safeco was reasonably justified in its denial of the Moores' theft loss claim.

Further, the Court cannot say that Safeco handled the Moores' theft loss claim in bad faith. When Mrs. Moore complained to her Safeco adjuster, someone in the background—not the adjuster, and, perhaps not even a Safeco employee—allegedly called Mrs. Moore a "bitch." (Doc. No. 19-1 at PageID 1368.) When Mrs. Moore again complained to Mr. Hughes, Mr. Hughes promptly reassigned the Moores' claim to another adjuster. He could not control Mrs. Moore's

dissatisfied reaction.  Moreover, Mr. Hughes responded professionally when Mrs. Moore attempted to scare him.  Assuming that an adjuster in Safeco's special investigation's unit was subsequently rude to Mrs. Moore, there is no evidence that the adjuster actually handled the Moores' claim in bad faith.  At most, the adjuster became rude when Mrs. Moore failed to be responsive to questioning.  In total, Safeco had a duty to handle the Moores' claim in good faith and it would seem to have done so.  However, Safeco's employees did not have a duty to happily withstand Mrs. Moore's abuse.

Therefore, the Court **GRANTS** Safeco's Motion with respect to the Moores' bad faith claim.

## IV.    <u>CONCLUSION</u>

Based on the foregoing, the Court **GRANTS, IN PART, AND DENIES, IN PART,** Safeco Insurance Company of Indiana's Motion for Summary Judgment (Doc. No. 20). Specifically, the Court finds as follows:

1. Safeco's Motion is **DENIED** with respect to the Moores' claims for declaratory judgment and breach of contract (Counts I & II), insofar as those claims relate to items allegedly stolen from the Moores' home on March 30, 2022;

2. Safeco's Motion is **GRANTED** with respect to the Moores' claims for declaratory judgment and breach of contract, insofar as those claims relate to items discarded from the Moores' home on March 31, 2022;

3. Safeco's Motion is **GRANTED** with respect to the Moores' claim for bad faith (Count III).  As such, Count III of the Complaint is hereby **DISMISSED**; and,

4. This action shall remain open on the Court's docket and proceed in accordance with the Court's Preliminary Pretrial Conference Order (Doc. No. 9).

**DONE** and **ORDERED** in Dayton, Ohio, this Wednesday, January 15, 2025.

s/Thomas M. Rose

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE